## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| MICHAEL E. GUNTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13-CV-1036-SMY-DGW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER FOLLOWING BENCH TRIAL

**YANDLE, District Judge:**

### INTRODUCTION

Plaintiff Michael Gunter filed the instant medical malpractice action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* ("FTCA"), alleging that certain physicians and employees of the Marion VA Medical Center ("Marion VA") were negligent in failing to timely diagnose and treat his prostate cancer. The Court conducted a four-day bench trial (Docs. 49, 50, 51, and 52) and now makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACTS

Michael Gunter was born on February 11, 1949. He is a former Marine who served in the Vietnam War (FPO, ¶ 1)[1]. After returning from Vietnam, Gunter worked for the United States Postal Service for 32 years, retiring in 2005 (*See* Trial Transcript ("Tr."), Volume ("Vol.") IV, p. 488, lines 14-15).

Gunter began prostate specific antigen ("PSA") screening around the age of 50 (*See*

---

[1] "FPO" is the citation to the Final Pretrial Order dated January 19, 2016 (Doc. 36) in which the parties stipulated to a number of undisputed facts.

Deposition of Christian Pavlovich, M.D., Doc. 38, p. 15, lines 4-6). PSA is a protein made by the prostate that can be elevated secondary to prostate cancer (Tr. Vol. II, p. 286, lines 2-8). A PSA above 4 is considered abnormal. *Id.* at 478, lines 11-13. Gunter's PSA levels were in the normal range until 2009 (Doc. 38, p. 15, lines 9-11).

### April 2009 and August 2009 Office Visits with Dr. Razia Sami

Gunter generally received his medical care from providers at the Marion VA. On April 29, 2009, he presented to Dr. Razia Sami, a primary care physician, to establish primary care with her (Tr. Vol. I, p. 37, line 25; p. 38, lines 1-5; FPO, ¶ 3). Dr. Sami had been a primary care physician at the VA since 2001, and was board certified in internal medicine until 2009 (FPO ¶ 18). Gunter was 60 years old at the time (Tr. Vol. I, p. 66, lines 16-18). Dr. Sami ordered a PSA on her initial visit with Gunter (FPO ¶ 3). The result was 4.534 and Dr. Sami ordered a repeat PSA on the same day. *Id.* The repeat PSA was 4.317 with a free PSA% of 12.05%. *Id.*

At trial, Dr. Sami testified that Gunter's age-specific PSA was borderline high, and that it could have been due to benign prostatic hypertrophy (BPH), some other benign cause, or cancer (Tr. Vol. I, p. 65, lines 20-24). She diagnosed Gunter with an elevated PSA and recommended that they actively monitor his PSA every six months. *Id*, p. 66, lines 6-9.

Gunter's next office visit with Dr. Sami was on August 5, 2009 (FPO ¶ 4). The August visit was a post-ER follow-up (Gunter had presented to the ER for a sinus problem and infection) (*Id*, p. 66, lines 6-9). The medical records reflect that Gunter had an "elevated psa" from the previous visit (Plaintiff's Core Medical Records from the VA, 890)[2]. Dr. Sami also charted that labs were "[e]valuated and [d]iscussed with the patient." *Id.* However, she concedes that there are no labs in the chart for August 5, 2009 (Tr. Vol. I, p. 78, lines 19-23). Due to Gunter's

---

[2] Plaintiff's VA Records were admitted into evidence on January 19, 2016 (Doc. 48).

elevated PSA, Dr. Sami ordered a urology consultation (VA 74; FPO ¶ 4).  She also ordered PSA testing for Gunter's next visit.  *Id.*

## October 9, 2009 Urology Consult with Dr. Johnson

Gunter saw urologist Dr. Kent Johnson at the Marion VA on October 9, 2009 (FPO ¶ 5).  Dr. Johnson is a board-certified urologist and was employed at the VA from 2006 until he retired in May 2015 (FPO ¶ 17).  During his visit with Gunter, Dr. Johnson ordered another PSA (FPO ¶ 5).  The result was 5.578 with a free PSA of 12.28%.  *Id.*  Dr. Johnson's impression was benign prostatic hyperplasia ("BPH") with rising PSA (VA 77-78).   It was also his impression that Gunter had a 42% chance of having prostate cancer (Tr. Vol. I, p. 81, lines 22-25; VA 77-78).  He testified that Gunter's lack of urinary symptoms did not make cancer less likely (Tr. Vol. I, p. 108, lines 20-23).  Dr. Johnson wanted Gunter to return to the urology clinic in four months with a PSA panel prior to his next appointment (FPO, ¶ 5).

Dr. Johnson's notes regarding his interaction with Gunter are minimal.  There is no indication in the records that Dr. Johnson explained the significance of an elevated PSA to Gunter, explained that Gunter had a 42% chance of having prostate cancer, discussed the pros and cons of performing a biopsy or that Dr. Johnson instructed Gunter to return in four months for a follow-up visit (Tr. Vol. I, pp. 82, lines 16-23; p. 84, lines 24-25; p. 85, lines 1-2).  However, at trial, Dr. Johnson testified that, based on his customary practice, he believes he spoke to Gunter about the 42% chance that he would have prostate cancer on a biopsy (Tr. Vol. I, p. 99, lines 22-25).

In contrast, Gunter testified that Dr. Johnson never instructed him to return for a follow-up appointment, and that had Dr. Johnson done so, he would have returned (Tr. Vol. IV, p. 535,

line 6).  Gunter also testified that Dr. Johnson never told him that he had a 42% chance of having cancer.  *Id.*, at p. 497, lines 12-15.[3]

The following policy regarding follow-up appointments was in effect in the urology clinic in 2009:

> "Follow-up appointments ordered by the specialist will be scheduled by the specialty clinic.  If the patient is present at the time the follow-up appointment is scheduled, the patient will be told of the appointment and notification of this will be made on the patient's appointment card.  If the patient is not present, a letter will be mailed to the patient."

(Tr. Vol. I, p. 86, lines 2-14).  The procedure the clinic followed was that Dr. Johnson would write down on a slip of paper when he wanted the patient to return (Tr. Vol. I, p. 166, lines 10-25).  The slip would be given to his nurse and the nurse would give the slip to the medical support assistant (MSA), who was responsible for scheduling the follow-up appointment.  *Id.*  No follow-up appointment with Dr. Johnson was actually scheduled for Gunter (FPO ¶ 5).[4]

## February 2010 and June 2010 Office Visits with Dr. Sami

Gunter returned to see Dr. Sami on February 23, 2010 (FPO ¶ 5).  She ordered another PSA test and the result was 4.968 (FPO, ¶ 5).  Although she was aware that four months had passed and Gunter had not followed up with Dr. Johnson, Dr. Sami did not talk to Gunter about the importance of returning to see Dr. Johnson (Tr. Vol. I, p. 51, lines 8-14).  She did not believe it was her responsibility to do so.  *Id.*

On June 14, 2010, Gunter presented to Dr. Sami for evaluation of headaches (FPO, ¶ 6).  Dr. Sami was aware Gunter had not returned to see Dr. Johnson and that it had been more than

---

[3] Specifically, Gunter testified that he was the type of person that would have been standing on Dr. Johnson's desk "hollering 42% chance, what are we going to do about it?" (Tr. Vol. IV, p. 497, lines 20-22).

[4]  During their testimony, Doctors Sami and Johnson suggested that the appointment was inadvertently not scheduled possibly because Gunter was the last patient of the day on a Friday afternoon before a holiday weekend (Tr. Vol. I, p. 165, p. 220) and the urology clinic was extremely busy and over-booked in 2009.  *Id.* at p. 59, lines 20-21.

eight months since his visit with Dr. Johnson (Tr. Vol. I, p. 54, lines 20-23). She did not have a conversation with Gunter about returning to see Dr. Johnson nor did she take any actions to facilitate his return to urology. *Id*. at p. 54, lines 24-25; p. 55, lines 1-7. She testified that it was not her job to facilitate his return to urology – rather, in her opinion, it was the responsibility of the patient and specialist. *Id*. This was Gunter's last office visit with Dr. Sami (FPO ¶ 6).

### September 2010 Office Visit with Nurse Practitioner Mabry

On September 14, 2010, Gunter presented to nurse practitioner Jamie Mabry for routine follow-up of chronic medical conditions (FPO, ¶ 7). Mabry was a primary care provider at the Marion VA. *Id*. She ordered a PSA and the result was 4.567. *Id*.

### August 2011 - May 2012 Office Visits with P.A. Steve Martinez

Steve Martinez has been a certified physician's assistant at the Marion VA since January 15, 2011 (FPO, ¶ 21). Martinez saw Gunter three times over nine months (Tr. Vol. I, pp. 127, lines 9-11). Those visits took place on August 3, 2011, November 2, 2011, and May 24, 2012 (FPO, ¶¶ 8-10).

On August 3, 2011, Martinez ordered a PSA (FPO, ¶ 8). The result of the test was 7.258, which was 20% greater than Gunter's PSA had been the prior year (Tr. Vol. I, p. 131, lines 23-25). Martinez's plan of care included ordering a free-PSA panel, having Gunter return in three months, and referring Gunter to urology if his PSA continued to elevate. *Id*. at p. 132, lines 1-7.

On October 27, 2011, Gunter's PSA level was 7.236 and his free PSA% was 11.46% (FPO, ¶ 9). Gunter returned to see Martinez on November 2, 2011. *Id*. Martinez did not make a urology referral, despite Gunter's elevated PSA levels and his concern that Gunter might have prostate cancer (Tr. Vol. I, p. 133, lines 21-23; p.136, lines 16-18). He did not review Gunter's medical records to determine whether he had been seen by a urologist. *Id*. at p. 137, lines 2-5. According to Martinez, he did not refer Gunter to urology because he was trying not to over-

diagnose something that may have just been inflammation (Tr. Vol. I, p. 151, lines 2-6).

Gunter next saw Martinez on May 24, 2012 (FPO, ¶ 10).  At that time, his PSA level was 8.057.  *Id*.  Gunter also had a free PSA % of 13.58, which showed an increase in his PSA percentage.  *Id*.  Martinez offered Gunter several DREs (digital rectal examinations), but Gunter declined (Tr. Vol. I, p. 145, lines 17-20).[5]  Gunter never had a positive DRE even after he was diagnosed with prostate cancer (Tr. Vol. I, p. 109, lines 11-13).  Martinez ordered a urology consult for Gunter during this visit (FPO, ¶ 10).

### Urology Consult and Prostrate Biopsy with Dr. Palagiri

On July 18, 2012, Gunter presented to Dr. Adiraju Palagiri at the Marion VA (FPO, ¶ 11).  Dr. Palagiri is a board-certified urologist who was employed at the Marion VA from September 2010 to December 2015 (FPO, ¶ 19).[6]  Dr. Palagiri ordered serial PSA testing on August 27, 2012, October 18, 2012, and October 25, 2012, with results of 7.028, 9.976, and 10.817, respectively (FPO, ¶ 11).[7]  He performed a biopsy of Gunter's prostate on November 30, 2012 which was positive for prostate cancer.  *Id*.  Dr. Palagiri then gave Gunter the name of Dr. Gerald L. Andriole, the Chief of Urologic Surgery at Washington University School of Medicine/Barnes-Jewish Hospital (Tr. Vol. IV, p. 502, lines 16-17).

### Medical Treatment Following Positive Biopsy

On January 31, 2013, Gunter presented to Dr. Andriole regarding his recent diagnosis of prostate cancer and to discuss treatment options (FPO, ¶ 12).  He was "leaning toward" a

---

[5]  "Often, the DRE can be used by urologists to help distinguish between prostate cancer and non-cancerous conditions such as BPH."  *PSA and DRE Screening*, Prostate Cancer Foundation 2018

[6] Gunter testified that Dr. Palagiri was the first medical provider to explain the significance of an elevated PSA to him (Tr. Vol. IV, p. 533, lines 5-8).

[7] **Summary of Gunter's PSA Results**

| 4/29/09 | 10/9/09 | 2/23/10 | 9/14/10 | 8/3/11 | 10/27/11 | 5/24/12 | 8/27/12 | 10/18/12 | 10/25/12 |
|---------|---------|---------|---------|--------|----------|---------|---------|----------|----------|
| 4.534, 4.317 | 5.578 | 4.968 | 4.567 | 7.258 | 7.236 | 8.057 | 7.028 | 9.976 | 10.817 |

laparoscopic radical prostatectomy after discussing his options with Dr. Andriole.  *Id*.  Dr. Andriole ordered an MRI which was performed on February 6, 2013 and which indicated extraprostatic extension with a suspicious obturator lymph node (FPO, ¶ 13).  The pathologist at Barnes Jewish Hospital reviewed the pathology and determined that Gunter had a Gleason score of 7.

On February 8, 2013, Dr. Andriole performed a laparoscopic bilateral pelvic lymphadenectomy in which 12 lymph nodes were removed – 4 were positive for metastatic prostate cancer (FPO, ¶ 14).  Gunter also had fiducial marker placement in order to receive guided radiation therapy.  *Id*.

Due to the metastatic prostate cancer and extraprostatic extension of the tumor, Dr. Andriole did not recommend radical prostatectomy.  Instead, the recommended treatment was external beam radiation therapy and hormone therapy (FPO, ¶ 15).  Gunter underwent radiation therapy to both the prostate and the pelvic lymph nodes (FPO, ¶ 16):  He received Casodex (hormone therapy) on February 22, 2013; androgen deprivation therapy from February 2013 until June 2015; received radiation therapy to the lymph nodes from April 22, 2013 until May 24, 2013; and radiation therapy to the prostate from May 28, 2013, until June 20, 2013.  *Id*.

## Damages

Gunter married his high school sweetheart, Sherida Spurlin-Gunter, on May 20, 2011 (Tr. Vol. II, pp. 236, lines 19-20).  He had a strong relationship with his wife prior to his cancer diagnosis and treatment (Tr. Vol. IV, p. 508, lines 23-25, p. 509, lines 1-8).  Although he experienced erectile dysfunction prior to his cancer diagnosis, it did not impede his sexual relations with his wife (Tr. Vol. IV, p. 508, lines 5-11).  After beginning radiation in 2013, Gunter was unable to engage in any sexual activity with his wife, which has been devastating for him.  *Id.* at p. 508, lines 23-25, p. 509, lines 1-8*; see also* Tr. Vol. II, p. 240, lines 6-24)*.*  He

worries that his emotional bond with his wife has also suffered.  *Id.* at p. 509, lines 1-8; *see also* Tr. Vol. II, p. 239, lines 15-23.  Gunter testified that the size of his penis has decreased.  *Id.* at p. 240, lines 6-24.  He feels humiliated and he no longer feels like a man (Tr. Vol. IV, p. 507, lines 24-25, p. 511, lines 4-10).

Gunter suffers from PTSD as a result of his military service.  *Id.* at 492, lines 5-6.  He testified that his cancer diagnosis has exacerbated his PTSD symptoms – including vivid nightmares.  *Id.* at 515, lines 14-21.  In addition, he has experienced the following side effects from radiation and hormone therapy: fatigue, urinary symptoms, loose bowel movements, fecal incontinence, impotence, hot flashes, weight gain, decreased muscle mass, decreased bone density, and breast tenderness (Tr. Vol. IV, p. 507, lines 1-10, lines 19-25, p. 514, lines 7-10; *see also* Tr. Vol. II, p. 239, lines 24-25; p. 240, lines 1-5).

Prior to his cancer diagnosis, Gunter was an enthusiastic supporter and advocate for the VA medical system in Marion (Tr. Vol. II, p. 197, lines 22-25, p. 198, lines 1-2).  He believed it was the "greatest institution in the world" (Tr. Vol. IV, p. 516, lines 8-9).  He now feels an immense sense of betrayal about his delayed diagnosis and has become bitter and cynical about the VA medical system.  *Id.* at p. 519, lines 6-20.

## Plaintiff's Expert Witnesses

### *Dr. Gerald Andriole*

Dr. Andriole, Gunter's treating urologist testified by deposition.  He could not say that an earlier biopsy would have absolutely disclosed Gunter's prostate cancer between 2009 and 2011 because biopsies can sometimes miss smaller cancers (Doc. 41, p.14, lines 7-14).  However, in his opinion, given the extent of the cancer detected on the 2012 biopsy, it is likely that a biopsy performed sometime between 2009 and 2012 would have likely shown cancer and it may have been smaller.  *Id.* at p. 14, lines 15-20.

Dr. Andriole utilized a nomogram prediction tool to calculate probabilities for organ-confined or lymph node metastic prostate cancer based on Gunter's PSA levels between April 2009 and October 2012:

|  | 4/2009 | 10/2009 | 2/2010 | 9/2010 | 8/2011 | 10/2011 | 8/2012 | 10/2012 | 10/2012 |
|---|---|---|---|---|---|---|---|---|---|
| % confined to prostate | 67 | 62 | 65 | 66 | 56 | 56 | 57 | 50 | 48 |
| % with positive lymph nodes | 4 | 4 | 4 | 4 | 5 | 5 | 5 | 6 | 6 |

(Doc. 44, p. 92). Based on the nomogram, Dr Andriole testified that the odds that Gunter's cancer was confined to the prostate fell from 67% to 48% from 2009 to 2012 and that the chances of lymph node involvement rose from 4% to 6% during that same period (Doc. 41, p. 23, lines 5-13).

In Dr. his opinion, a PSA is usually better than a DRE for detecting cancer (Doc. 41, p. 42, line 8). According to Dr. Andriole, under the applicable standard of care for urologists, a PSA above 4 would trigger further testing to confirm whether the PSA was truly above 4. *Id.* at p. 14, lines 1-6. If confirmed, it would be worth discussing whether to proceed with a prostate biopsy. *Id.* Also, consistent with the standard of care, Gunter's abnormal serial PSA measurements should have initiated a discussion with either his urologist or primary physician to strongly consider a prostate biopsy sooner than 2012 (Doc. 41, p. 16, lines 15-23).

Regarding a rising PSA in a high grade cancer, Dr. Andriole testified:

Well, I mean as the cancers get larger more PSA tends to enter the circulation. That's why it rises from a normal level to a level greater than 4…The main factors are, related to the tumor: Is what is the PSA, how big is the cancer, and the surrogate for that is how many of the biopsy pieces were involved, and the third criterion is the stage of the cancer. Is there any evidence that its left the prostate either locally by growing through the edges or distantly spreading to nodes or bones…

(Doc. 41, p. 41, lines 10-12; 17-23).

According to Dr. Andriole, higher grade Gleason cancers are more likely to require combination therapies – whether its radiation hormones or surgery and hormones – but treatment depends not just on the Gleason score, but other factors such as the size of the cancer and whether the cancer has metastasized or advanced within the prostate (Doc. 41, p. 19, lines 13-17).

Dr. Andriole agreed with Dr. Pavolich that it is probable that had Gunter had a biopsy between 2009 and 2011, one of the biopsies would have been positive (Doc. 41, p. 79, lines 10-15). He also agreed that if the cancer had been diagnosed earlier, it would have been confined to the prostate. *Id*. at p. 79, lines 16-19.

Dr. Andriole further agreed that had Gunter undergone a radical prostactectomy, he would have been more likely to avoid radiation and hormone therapy and their associated side effects including, fatigue, impotence, muscle pain, headaches, hair loss, and irritable bowel. *Id*. at p. 81, lines 2-7. Regarding Gunter's side effects from radiation and hormone therapy, Dr. Andriole testified that the side effects should abate when treatments are discontinued. *Id*. at p. 43, lines 3-21. In his opinion, Gunter's future erectile ability is "a moving target" that could be due to aging or the treatments. *Id*. at p. 44, lines 15-20.

### *Dr. Kevin Ferentz*

Dr. Ferentz, a board certified family practice physician (FPO, ¶ 27), testified by deposition. Dr. Ferentz testified that a PSA above 4 is considered abnormal, and that the standard of care requires a primary care physician to refer a patient with a PSA above 4 to a urologist (Doc. 39, p. 13, lines 13-19).

In his opinion, Dr. Sami breached the standard of care on February 23, 2010 and June 14, 2010, by failing to facilitate a follow-up appointment for Gunter when she was aware that Dr. Johnson wanted a follow-up visit in four months. *Id*. at p. 19, lines 3-24. He explained that

when the patient is seen following the referral, it is important for the primary care physician to inquire about what happened. *Id*. at p. 18, lines 5-25.

Dr. Ferentz further opined that Dr. Sami breached the standard of care by failing to explain the significance of an elevated PSA to Gunter. *Id*. He noted that Dr. Sami's notes were identical for each visit and appeared to be boiler-plate:

> I am basing it on the fact that if you had a patient who had an elevated PSA and you were concerned about prostate cancer, you would not simply say, results discussed or, you know, PSA noted and discussed – I don't remover the exact verbiage – but you would actually write down, patient was supposed to return to urologist because of concerns for prostate cancer, patient informed, you know, very important to follow up with urologist because of concerns for prostate cancer. It wouldn't be merely sort of boilerplate language about that….When you're dealing with issues of cancer or life and death kinds of things, it would make sense that a physician would document those kinds of conversations because it's important.

(Doc. 39, p. 24, lines 19-25, p. 25, lines 1-5). In his opinion, these deviations in the standard of care led to a delay in the diagnosis of Gunter's prostate cancer. *Id*. at p. 21, lines 17-19.

### *Robert Johnson, P.A.*

Robert Johnson, a Certified Physician Assistant (FPO, ¶ 29), testified by deposition. Johnson testified that the standard of care requires a referral to a urologist for an elevated PSA above 4 (Doc. 40, p. 20, lines 3-7). In his opinion, P.A. Martinez breached the standard of care on August 3, 2011 and November 2, 2011 by failing to refer Gunter to a urologist when he had a consistently elevated PSA level above 4. *Id*. at p. 21, lines 7-23. Johnson further opined that Martinez breached the standard of care by failing to inquire of Gunter whether he had been seen by the urologist and if so, what the urologist's plan was moving forward. *Id.* at p. 24, lines 9-15.

### *Dr. Christian Pavlovich*

Dr. Christian Pavlovich, a board-certified urologist who completed a fellowship in urologic oncology (FPO, ¶ 28), testified by deposition. In his opinion, a median PSA for a man Gunter's age would be somewhere between .5 to 1.5 and that anything above 4.0 would be in the

top five percentile of PSAs for men his age (Doc. 38, p. 16, lines 17-21). According to Pavlovich, although there can be many reasons for an elevated PSA that are not prostate cancer, none of those were relevant in Gunter's case. *Id*. at p. 17, lines 3-21. First, there was no history of prostatitis, or benign prostatic hyperplasia. *Id*. In addition, although there were fluctuations between 4.5 and 5.5 in his PSA, there was an underlying driver for the abnormally high PSA which in this case was very likely prostate cancer. *Id*. at p. 23, lines 1-7. In his opinion, all of Gunter's fluctuations were well above any semblance of a normal range considering the average PSA at age 60 is about 1. *Id*. at p. 22, lines 22-25; p. 23, line 1. Regarding Gunter's lack of symptoms associated with an elevated PSA, he noted:

> I worry quite a bit when all I see is an isolated PSA because there are so many reasons to have an elevated PSA that can be associated with symptoms. When there are no symptoms, and we know the prostate is not large, we really have no reason to – we can't pin that PSA on any other pathology…When we see repeated PSAs all abnormal, a low percent free PSA, and no other explanations, it actually raises my antennas up, and I worry more about a prostate cancer (Doc. 38, p. 26, lines 5-11; 19-22).

He does not usually have patients who get four PSAs in one year, all of which are abnormal, none of which has led to a biopsy (Doc. 38, p. 93, lines 15-22).

Dr. Pavlovich opined that the standard of care for a urologist treating patients with elevated PSA levels requires recommending a prostate biopsy, discussing the pros and cons of biopsy, and discussing the risks of prostate cancer (Doc. 38, p. 25, lines 6-10). In his opinion, more likely than not, Gunter's cancer was localized until sometime between mid-2010 and late 2011 based on the PSA kinetics and the PSA elevation that was present for quite some time. *Id.* at p. 35.

Dr. Pavlovich also opined that if Gunter's diagnosis had occurred when the cancer was localized, he would have been a candidate for a radical prostatectomy – the only potential cure. *Id.* at pp. 46-48. Earlier detection would have also allowed Gunter to entertain more treatment

options.  *Id.* at p. 48, lines 3-6.  Instead, Gunter underwent radiation and hormone therapy, suffering the side effects of both, and has a greater than 50% chance of having recurrence.  *Id.* at pp. 50-51.  In his opinion, Gunter is impotent as a result of the radiation therapy, has fecal incontinence as a result of the radiation therapy, and has a decreased bone density as a result of the hormone therapy.  *Id.* at pp. 39-40, 44-45, 53-56.

### Defendant's Expert Witnesses

### *Dr. John Daniels*

Dr. John Daniels is a board-certified internal medicine physician (FPO, ¶ 31).  Dr. Daniels testified that PSA elevation may occur for non-cancer reasons (Tr. Vol. III, p. 463, lines 12-15).  He opined that Gunter's diagnosis of prostate cancer was clearly delayed, but that Dr. Sami did not provided substandard care to Gunter.  *Id.* at p. 465, lines 11-13.

According to Dr. Daniels, Dr. Sami obtained and discussed his elevated PSA levels and referred Gunter to a urologists – "which is really the function of the primary care physician." *Id.* at p. 465, lines 17-23.  He concedes, however, that it would be a breach of the standard of care if Dr. Sami was aware that Gunter had not followed-up with urology and failed to discuss the importance of following-up with a urologist for an elevated PSA.  *Id.* at p. 477, lines 8-15.

### *Dr. Arnold Bullock*

Dr. Arnold D. Bullock is a board-certified urologist (FPO, ¶ 30).  Dr. Bullock testified that the standard of care required Dr. Johnson to explain the significance of an elevated PSA and to explain the pros and cons of a biopsy to Gunter (Tr. Vol. III, p. 431, lines 7-10).  He noted that he would like to have seen more documentation in Dr. Johnson's notes regarding the urology consult.  *Id.* at p. 431, lines 11-15.  However, he believes that Dr. Johnson discussed Gunter's elevated PSA with him, although there is no indication of a discussion in Dr. Johnson's notes. Id. at p. 417, lines 23-25; p. 418, lines 1-14.

In his opinion, Dr. Johnson met the standard of care for the evaluation and treatment of Gunter's elevated PSA in the October 2009 urology consultation, and a prostate biopsy at the time was not required. *Id.*

### Dr. Aymen Elfiky

Dr. Aymen Elfiky, is a board-certified medical oncologist and completed a fellowship in genitourinary oncology (FPO, ¶ 32). Dr. Elfiky testified that PSA elevation and PSA fluctuations may occur for non-cancer reasons, including enlarged prostate (BPH or benign prostatic hypertrophy), inflammation, and infection (prostatitis) (Tr. Vol. III, p. 286, lines 12-17). As a medical oncologist, he uses PSA to gauge how well a treatment may be working or if the cancer is developing some type of resistance. *Id.*, p. 286, lines 22-25. Prior to diagnosis, however, PSA is used as a standard – it is used in all cases because it is the best that there is for now. *Id.* at p. 287, lines 9-11. In his opinion, the higher the PSA, the more likely that cancer is the cause. *Id.* at p. 311, lines 11-12.

Dr. Elfiky noted that Gunter had fluctuations in his PSA levels between 1999 and up to 2012, but no clear trend or rise in PSA until 2012. *Id.* at p. 306, lines 5-18. He testified that a patient could have fluctuations and still have prostate cancer. *Id.* at p. 331, lines 3-9. In his opinion, more likely than not, Gunter had the start of cancer in 2011 and that the cancer was localized. *Id.* at p. 339, lines 23-25. Dr. Elfiky also opined that had a biopsy been performed in 2011, more likely than not, the biopsy would have been positive and organ-confined. *Id.* at p. 340, lines 1-8.

High grade Gleason score prostate cancers (7, 8, 9, 10) are aggressive and more likely to grow rapidly and spread out of the prostate and through the bloodstream and lymph system. *Id.* at pp. 282-284. Because of their aggressive nature, high grade Gleason score prostate cancers compared to low grade Gleason score prostate cancers are more likely to have micro-metastatic

disease, to spread outside of the prostate. This is so even if it is not obvious on tests for metastasis (i.e., scans), with the onset of metastasis occurring in a very short interval between initially starting in the prostate and then spreading out. *Id.* at p. 291, lines 11-25; p. 292, lines 1-8.

In his opinion, because Gunter's cancer was not organ-confined, surgery would not have sufficiently addressed the extent of his disease and he would have required adjuvant or further therapy with both radiation and hormone therapy. *Id.* at p. 320, lines 14-20. Dr. Elfiky testified that hormonal suppression therapy may result in temporary reversible side effects of male menopause that resolve when hormonal therapy is stopped. *Id.* at p. 274, lines 3-25, p. 275, lines 1-21. These symptoms may include hot flashes, fatigue, loss of muscle mass, weight gain, low libido, osteopenia, or osteoporosis. *Id.*

Patients who are diagnosed with localized prostate cancer and undergo a radical prostatectomy have a lower risk of recurrence and a higher survival rate compared with patients, like Gunter, who are diagnosed with metastatic prostate cancer and undergo radiation and hormone therapy. *Id.* at p. 355, lines 10-20.

### *Dr. Robert Shavelle*

Dr. Robert M. Shavelle, Ph.D., FAACPDM is a life expectancy expert (FPO, ¶ 33). The standard life expectancy tables for a U.S. male at age 65 (when Dr. Shavelle prepared the report) showed that Gunter would live an additional 17 years (Tr. Vol. III, p. 380, lines 1-4). Dr. Shavelle computed Gunter's life expectancy under two scenarios. Under the first scenario, if Gunter's cancer had been diagnosed when it was localized, he would have a normal life expectancy. *Id.* at p. 381. The second calculation was based on the November 2012 diagnosis date and the staging of the Gleason score as an 8 or 9. Under the second scenario, Gunter's life expectancy is reduced by 2.4 years. *Id.* at p. 390, lines 10-11.

## CONCLUSIONS OF LAW

The Federal Torts Claims Act ("FTCA") provides, in pertinent part, that the United States is liable for personal injuries caused by the negligent or wrongful acts of federal employees acting within the scope of their employment "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1346(b)(1). In suits properly brought under the FTCA, the United States District Court applies the law of the state in which the acts or omissions occurred. 28 U.S.C. § 1346(b)(1). In this instance, the alleged negligent acts occurred at the Marion VA located in Marion, Illinois. Accordingly, Illinois law governs this matter.

Under Illinois law, a plaintiff must establish the following elements to prevail in a medical malpractice action: (1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care. *See Massey v. United States*, 312 F.3d 272, 280 (7th Cir. 2002).

Unless the physician's negligence is "so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson, expert medical testimony is required to establish the standard of care and the defendant physician's deviation from that standard." *Massey*, 312 F.3d at 280. "The weight given to medical expert testimony is for the trier of fact to determine." *Kasongo,* 523 F.Supp.2d at 793. Here, testimony from a primary care physician, urologist, and physician assistant are required to establish the standard of care applicable to and any deviations from that standard by Dr. Sami, Dr. Johnson, and PA Martinez. *See Sullivan v. Edward Hosp*., 806 N.E.2d 645, 653 (Ill. 2004) ("the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify.").

The Court had before it the testimony of four urologists (Dr. Andriole, Dr. Johnson, Dr. Pavlovich, and Dr. Bullock), three primary care physicians (Dr. Sami, Dr. Ferentz, and Dr.

Daniels), one oncologist (Dr. Elfiky), and two physician assistants (PA Martinez and PA Johnson). In the case of dueling experts, the Court as fact finder must "determine what weight and credibility to give the testimony of each expert and physician." *Gicla v. United States,* 572 F.3d 407, 414 (7th Cir. 2009) (affirming district court's factual findings and its credibility assessments where they were supported by the record and concluding that the court had not committed an error).

### Deviations from the Standard of Care by Dr. Sami

Gunter treated with Dr. Sami four times during a 14-month period. At each office visit, Gunter's PSA levels were elevated – spanning between 4.317 and 5.578. With the exception of Dr. Sami, all of the primary care physician experts agree that the standard of care required her to: (1) explain the significance of an elevated PSA to Gunter; (2) refer Gunter to a urologist following his elevated PSA levels; and (3) to facilitate a follow-up appointment and explain the importance of a follow-up appointment to Gunter.

Based on the credible evidence in this case, including the expert testimony, Dr. Sami violated the standard of care on February 23, 2010 and June 14, 2010, when she failed to facilitate and explain the significance of a follow-up appointment to Gunter. Dr. Sami concedes that she was aware that Gunter had not returned to urology, but she did not have a conversation with him about the importance of returning to see Dr. Johnson, nor did she take any actions to facilitate Gunter's return. In her opinion, it wasn't her job and the standard of care did not require her to do any more than she did – refer the patient to urology. It was Gunter's responsibility to secure a follow-up appointment with Dr. Johnson and to make sure he kept it.

The primary care physician experts both disagree. According to Dr. Ferentz and Dr. Daniels, the standard of care required Dr. Sami to have a discussion with Gunter regarding the importance of follow-up if she was aware that Gunter had not returned to see Dr. Johnson as

ordered (according to his records). This is particularly significant given Gunter's continual abnormal PSA levels. The Court finds Dr. Sami's testimony that she met the standard of care unreliable, self-serving, and unpersuasive.

Dr. Sami also breached the standard of care by failing to explain the significance of an elevated PSA to Gunter. Dr. Sami does not have a specific recollection of her four office visits with Gunter. However, Gunter testified that, although Dr. Sami told him he had an elevated PSA, she never explained the significance of his abnormal PSA, including the fact that PSA levels over 4 can be associated with prostate cancer. The Court finds Gunter's testimony credible.

After weighing the evidence, the Court finds that the United States, acting by and though its employee Dr. Sami, deviated from the applicable standard of care and was negligent in failing to take actions to ensure that Gunter returned to see Dr. Johnson and by failing to counsel him on the significance of an elevated PSA.

### Deviations from the Standard of Care by Dr. Kent Johnson

Based on the credible expert testimony, the Court finds that the standard of care required Dr. Johnson to explain the significance of an elevated PSA and the possible risk of prostate cancer to Gunter, to discuss the pros and cons of performing a biopsy, and to order a follow-up appointment.[8] The Court further finds that Dr. Johnson breached the standard of care by failing

---

[8] Based on his interest, bias, and manner while testifying and the lack of reasonableness of his testimony in light of all the medical evidence, the Court finds the opinions offered by Dr. Bullock on behalf of the defendant to lack credibility, and therefore affords very little weight to the same. Dr. Bullock's primary opinion, that Dr. Johnson met the standard of care by discussing with Gunter the significance of his elevated PSA and the pros and cons of a biopsy, is based on mere conjecture. When asked, "Is there an indication in the records that Dr. Johnson engaged in such a discussion?", Dr. Bullock responded, "I contend that, why would you take time writing all of this information without discussing it to the patient? It would just be quite an unusual situation that someone would see urologist for the purpose of – indication for the person's visit is an elevated PSA. I just can't fathom how you could have a visit to a specialist and have no discussion of why you're there, being that elevated PSA is one of the most common reasons for a person seeing a urologist." (Tr. Vol. III, p. 418, lines 15-25). Dr. Bullock offered no other basis for his opinion – *ipse dixit* does not suffice. *See Gen. Elec. v. Joiner,* 522 U.S. 136, 146 (1997); *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003)("The court is not obligated to admit testimony just because it is given by

to explain the significance of an elevated PSA to Gunter, failing to explain that he had a 42% chance of having prostate cancer, failing to discuss the pros and cons of performing a biopsy, and failing to instruct Gunter to return in four months.

Although Dr. Johnson testified that he always discussed the pros and cons of a biopsy with patients and did so in 2009 with Gunter, he did not have an independent recollection of treating Gunter. Significantly, there is no documentation in the medical records indicating that Dr. Johnson ever had the required discussions with Gunter. Indeed, the medical records are sparse regarding Dr. Johnson's interaction with Gunter.

Gunter testified that he was never told that he had a 42% chance of having prostate cancer and that had Dr. Johnson communicated that information to him, "he would have been standing on Dr. Johnson's desk hollering 42% chance, what are we going to do about it?" Gunter also testified that he was never told that he needed to return to urology in four months; if he had been told to return and had advised of his risks of having prostate cancer, he would have complied.

Gunter's testimony is credible. In light of the totality of the evidence in this case, the Court finds it highly unlikely that if Gunter was told he had a 42% chance of having prostate cancer, he would do nothing. Accordingly, the Court finds that the United States, acting by and through its employee Dr. Johnson, deviated from the applicable standard of care for a urologist treating patients with elevated PSAs, and was therefore negligent.

### Deviations from the Standard of Care by P.A. Steve Martinez

The Government did not proffer an expert to defend the conduct of Steve Martinez. Gunter's expert, Robert Johnson, testified convincingly that the standard of care required a urology referral for a PSA level above 4 and that Martinez breached the standard of care on

---

an expert."). Moreover, the Court notes that Dr. Bullock was impeached on several occasions during trial with his inconsistent deposition testimony.

August 3, 2011 and November 2, 2011, by failing to refer Gunter – who had PSA levels of 7.258 and 7.236 – to a urologist.

Martinez attempted to defend his own conduct, but his testimony was self-serving and lacked credibility. Specifically, Martinez testified that although he was concerned Gunter might have prostate cancer, he did not refer him to a urologist because in his opinion, "he was just as qualified as a urologist to evaluate a patient who potentially had prostate cancer." Unfortunately, he was not.

The Court finds that the United States, through its employee Steve Martinez, breached the standard of care and was negligent by failing to refer Gunter to a urologist.

## Causation

Proximate cause encompasses both cause in fact and legal cause. *Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012) *citing Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (1992). Under Illinois law, proximate cause is defined as follows:

> "…a cause that, in the natural or ordinary course of events, produced the plaintiff's injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

*See* Illinois Pattern Jury Instructions Civil ("IPI") 15.01. A plaintiff must establish that the defendant deviated from the standard of care *and* that that deviation was a proximate cause of the plaintiff's injury. *Buck v. Charletta*, 994 N.E.2d 61, 72 (2013).

Here, the undisputed expert testimony establishes that PSA levels above 4 are considered abnormal and can be associated with prostate cancer. The higher the PSA, the more likely that cancer is the cause. From April 2009 until his diagnosis in late 2012, Gunter's PSA was consistently abnormal – ranging from 4.317 to 10.817. Despite his persistent abnormal PSA levels, Gunter did not receive a biopsy until November 2012.

Following the biopsy, Gunter was diagnosed with a high grade Gleason (4+3) 7 to 8 prostate cancer which had metastasized to his pelvic lymph nodes. Acccording to his treating urologist, Dr. Andriole, given the nature and extent of the cancer detected on the biopsy, an earlier biopsy would have likely detected the cancer, which would have likely been smaller. The credible medical testimony establishes that Gunter's cancer was localized until sometime between mid-2010 and late 2011.

The Government argues that it's not Gunter's PSA levels that are significant, but instead but rather his high grade Gleason prostate cancer, which is the determining factor for his treatment and prognosis. However, the Court credits the expert testimony that if Gunter's cancer had been diagnosed when it was still organ-confined, he would have been a candidate for a radical prostatectomy – the only potential cure for his prostate cancer.

Both Dr. Pavlovich and Dr. Andriole testified if the cancer had been diagnosed when it was localized, more likely than not, Gunter would have avoided radiation and androgen deprivation therapy. The experts also agree that had Gunter's cancer been diagnosed when it was localized, he would have had a reduced risk of recurrence. Instead, Gunter has a greater than 50% chance of recurrence and a reduced life expectancy. Thus, the Court concludes that the failures of the United States to timely diagnose and treat Gunter's prostate cancer between 2009 and late 2011 was a proximate cause of his damages.

### Contributory Negligence

Based on the weight of the evidence, the Court concludes that Gunter was not contributorily negligent. The United States asserts that Gunter caused or at least contributed to his delayed diagnosis because he did not return to urology four months after seeing Dr. Johnson. However, the Court is persuaded by Gunter's testimony that he was never told to return to urology in four months. The Government's witnesses' attempts to explain why and how Gunter

was not actually scheduled for follow-up bolsters Gunter's credibility on this point. Additionally, although Gunter was seen by Dr. Sami and P.A. Martinez on several occasions following his urology visit, neither of these medical professionals discussed follow-up with him.

The United States also argues that Gunter contributed to his untimely diagnosis by refusing a DRE and delaying his urology appointment with Dr. Palagiri by two months. As previously noted, Gunter was not appropriately counseled regarding the significance of his elevated PSA, the 42% risk of prostate cancer, the importance of a follow-up appointment or any aspect prostate cancer screening. As such, none of his actions were a proximate cause of his resulting damages.

## PLAINTIFF'S DAMAGES[9]

In this case, Gunter seeks damages for disfigurement, pain and suffering, loss of a normal life, and shortened life expectancy – all of which are elements of damages that can be awarded in Illinois, taking into consideration the nature, extent and duration of the injury. *See*, IPI 30.01, 30.04, 30.04.02, and 30.05.

### Disfigurement

Under Illinois law, disfigurement is a separate and compensable element of damages. *See* IPI 30.04; *Holston v. Sisters of the Third Order of St. Francis,* 650 N.E.2d 985, 997 (Ill. 1995) (large surgical slashes to Gunter's body supported a disfigurement award). Illinois courts have defined the term "disfigure" to mean "less complete, perfect, or beautiful in appearance or character." *Holston,* 650 N.E.2d at 997.

Gunter testified that he has gained weight, lost muscle mass, and that his penis decreased in size as a result of hormone therapy. According to credible medical expert testimony, weight gain and loss of muscle mass are side effects of the hormone therapy. However, the medical

---

[9] Plaintiff made a claim for damages in the amount of $2,500,000 in his administrative tort claim submission (Standard Form 95) (Doc. 48).

experts agree that hormone therapy does not affect a man's penis length.  Dr. Andriole, testified that it could be that Gunter has not been getting erections, and that as a result, his penis appears smaller.  Accordingly, the Court finds that Plaintiff is entitled to **$25,000** for disfigurement based on his weight gain and lost muscle mass.

### Pain and Suffering

A plaintiff may be awarded damages as a result of pain and suffering (including emotional distress) experienced and reasonably certain to be experienced in the future as a result of the injuries.  *See* IPI 30.05.  There is no question that Gunter has, and will in the future continue to suffer both physical and emotional pain and suffering as a result of the delayed diagnosis of his prostate cancer.  Physically, Gunter has experienced numerous side effects from radiation and hormone therapy, which, had his cancer been diagnosed when it was confined, he would not have been subjected to.  These include, including fatigue, urinary symptoms, loose bowel movements, fecal incontinence, impotence, hot flashes, weight gain, decreased muscle mass, decreased bone density, and breast tenderness.

Emotionally, Gunter feels inadequate due to impotence and suffers from severe anxiety related to the uncertainty of his prognosis.  Prior to his delayed cancer diagnosis, Gunter was an enthusiastic supporter and advocate for the VA medical system in Marion.  He now feels an immense sense of betrayal as a result of the VA's delayed diagnosis.  The emotional distress associated with this sense of betrayal is compensable.  The Court is also persuaded that emotional distress and anxiety resulting from the delayed diagnosis has also exacerbated his PTSD symptoms – including vivid nightmares.  Accordingly, the Court finds that Plaintiff is entitled to **$750,000** for his past and future pain and suffering.

**Loss of a Normal Life**

Loss of a normal life is defined as "the temporary or permanent diminished ability to enjoy life. This includes a person's inability to pursue the pleasurable aspects of life." *See* IPI 30.04.02. Gunter testified that due to radiation and hormone therapy, he has experienced side effects including fatigue, urinary symptoms, loose bowel movements, fecal incontinence, impotence, hot flashes, weight gain, decreased muscle mass, decreased bone density, and breast tenderness. He has also lost his ability to engage in any sexual activities with his wife. Although some of the side effects of the radiation and hormone therapy may eventually abate, the Court can and award Gunter damages for both the temporary and permanent diminished ability to enjoy life. Accordingly, the Court finds that Plaintiff is entitled to **$750,000** for his loss of a normal life.

**Reduced Life Expectancy**

Reduced life expectancy is recognized as a separate element of compensable damages. *See* IPI 30.04.05; *Bauer ex rel. Bauer v. Memorial Hosp.*, 377 Ill.App.3d 895, 920–921 (5th Dist. 2007); *Dillon v. Evanston Hosp.*, 199 Ill.2d 483, 500 (2002); *see also DePass v. United States*, 721 F.2d 203, 208 (7th Cir. 1983)(Posner, J. dissenting) (Illinois law does not permit a tortfeasor to get off scot-free because, instead of killing the victim, he inflicts an injury that is likely to shorten the victim's life).

Here, Dr. Shavelle testified that if Gunter's cancer had been diagnosed while it was still localized, his life expectancy would not be reduced. Instead, Gunter's life expectancy has been reduced by 2.7 years as the result of the delayed diagnosis and treatment of his prostate cancer. Accordingly, the Court finds that Plaintiff is entitled to **$405,000** for the reduction of his life expectancy.

**Reduction of Benefits Received**

As an affirmative defense, the United States asserts that any damages recovered by Gunter should be reduced by the amount of any benefits that he received or will receive in the future from the United States. Specifically, the United States contends that any award should be reduced by the amount that Gunter received from the VA due to prostate cancer and by the amount he will receive from the VA due to prostate cancer in the future based on his life expectancy.

Daniel Howell, a decision review officer on the quality review team for the VA, testified that the United States would not recoup anything from Gunter's settlement or judgment because Gunter's tort claim is related to his misdiagnosis:

> He is service-connected for the prostate cancer disability, so if he gets a tort claim, we're not going after the award incurred because of malpractice…there is no offset with a judgment or settlement, not in this case… the tort claim is based off a misdiagnosis, so it's got nothing to do with the VA compensation benefits.

(Doc. 42, p. 18, lines 8-11; lines 19-20; p. 19, lines 3-5). Accordingly, there is no basis for a reduction of the award pursuant to this affirmative defense.

## <u>CONCLUSION</u>

Judgment will be entered in the amount of **$1,930,000** in favor of Plaintiff Michael Gunter and against Defendant the United States of America in accordance with this Memorandum and Order. Further, Plaintiff is awarded costs and shall file a petition for the same within 30 days from the entry of this Order.

**IT IS SO ORDERED.**

**DATED: January 19, 2018**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**